My name is David Gottlieb, counsel for Ángel Estrada-Corona, who has filed a petition to review the decision of the Board of Immigration Appeals. As with the last case, the BIA decision overturned for a second-time grant by the Immigration Court of deferral of removal under the Convention Against Torture. Two different immigration judges in this case had concluded that it was more likely than not that if Estrada was sent back to Mexico, that he would be executed by one or another of the major Mexican cartels, and that the killing would occur with the acquiescence of local law enforcement. Our position is that the BIA could not overturn the fact determinations by the immigration judge that were the heart of the decision. Our position is that the BIA could not overturn the fact determinations by the immigration judge that were the heart of the decision. Our position is that the BIA could not overturn the fact determinations by the immigration judge that were the heart of the decision. Your Honor, they do that when they talk about their power of review, but then when they review the decision of the court, they do not claim to be reviewing, for example, credibility decisions or fact findings that were made by the immigration judge. There's very little discussion whatsoever of anything that the immigration judge said. And in fact, the government brief takes the position that there is no review, factual review, that is being engaged in, in this case, and that rather this is simply an application of the requirements of JFF that this was a legal decision rather than a factual review. Well, why don't we focus on what they actually said and see why that's not enough. You have the BIA's decision in front of you? I do have it, and I'm also familiar with the decision, Your Honor. Simply yes will do. Do you have it? I don't have it in front of me right now. Well, go get it. I mean, this is a thing you came to overturn. Surely have it with you so we can talk about it. I apologize, Your Honor. It's also in the back of your brief, if you have your brief with you. You see the paragraph on page four of the record, page two of the decision? We agree with the first full paragraph. We agree with DHS at that point. You see that paragraph there? I'm familiar with it, yes, Your Honor. And they list certain things, and they say these alone are critical omissions of proof. And they explain exactly why it is that they reversed the IJ. What's wrong with that? Well, because they're making a determination, I believe, under JFF, that there were linked series of hypotheticals that were not established. Right after the sentence that Chief Judge Kaczynski was mentioning, when they get to specifics, the first thing they say is, quote, in this case the applicant has not shown, among other things, the basis of his family member's alleged assumption that he took over the drug cartel after his cousin's death. That wasn't what the IJ found. It wasn't the family member's assumption. It was the assumption of the other cartel, yes? That's correct, Your Honor. So in the very first sentence of their disagreement with the IJ, they get it wrong. That's correct, Your Honor. After that, their next sentence of the testimony... But then they continue, on the basis of anyone's belief that he turned over information to the Drug Enforcement Administration. The full sentence actually refers to both family members and belief of other people. That's not wrong, is it? That's the difference. What's wrong with that? He testified repeatedly that family members who he knew called him and threatened him. In fact, he changed his number, then he went into hiding, then he was kidnapped. He was kidnapped by an individual who was a cousin. He did not have a normal upbringing. He was raised in an extended family that included the cartel that runs Tijuana. He knew them. They knew him. And he testified that a couple of his family members were cooperating with the government. He testified that there were informants in the jail where he was. The evidence was replete with information that supported an inference. No one testified from the DEA, correct? That is also correct. So there seems to be implicit, at least, in the paragraph we're looking at, that the BIA is saying that it is his statement about his cooperation with the DEA was so not only uncorroborated, but flawed on its face, that even under a clear error standard, it wasn't to be believed. What about that? Well, first of all, Judge Rakoff, that's not what they, in fact, they didn't say that. Well, they say, with regard to the DEA, the applicant was unable to identify any specific individuals responsible for the family's alleged belief that he was working for the agency. He did not claim to have actually testified for the DEA, and he did not provide the names of any DEA agents. He did provide the name of an agent, Montez, who he said was from Ramones. His excuse for not giving other names was that they were on his cell phone and he didn't have his cell phone. If he had dealt with them at any length, one would have imagined that he would have remembered their names. Do you need the cell phone to remember the name of a DEA agent or agents that you are in an allegedly life-threatening situation cooperating with? And indeed, Judge Rakoff, if the DEA were making a statement that it was reversing the credibility determination of the immigration judge, there would have been at least something to argue about. But the BIA statement at the beginning, their decision at the beginning, states that they're accepting the credibility finding of the immigration judge, rather than denying it. And it seems to me that the testimony fairly directly supports the view that he cooperated with these law enforcement agencies. They also get it wrong in terms of saying that he never identified anyone by name, because he did identify somebody by name, an agent Montez, who he says was from Ramona, in the testimony. In our view, that's just making adverse credibility judgments, attempting to apply a substantial error standard that they don't articulate, that is not accompanied by an analysis of the facts that the IJ actually found in this case. Now, wasn't their point was that everything, all the links in the chain were too speculative? I think that's what they say. And his cooperation with the DEA, accepting even his testimony as true, was so non-public, didn't involve any testimony, that the notion that anyone would have inferred that he was working for the DEA and therefore set out to kill or torture him when he returned was highly speculative. And I think that's the point they were making, yes. But Judge Rakoff, even if one accepts that, there is his testimony that he was threatened on a daily basis by family members who he knew as cartel members. You have the testimony that he was threatened with kidnapping. One of the kidnappers was a cousin who was in the cartel. However, they came to the conclusion that he was cooperating with the government. There is a finding that the immigration judge makes that he's credible. And our position is you can't kind of invent interdependent chains of evidence when they're not, in fact, interdependent. In this particular case, it was quite enough, we would submit, if he gave credible testimony that he was being pursued by cartel members. And that's the testimony that he gave in this case. What about the next paragraph, where the board rejects the fact that this is not true? This was acquiesced in by the Mexican authorities. Yes. The law in this case, as found in Ramirez-Pero v. Holder and in this circuit's decision after our original brief was cited, Madrigal v. Holder, and I'm pretty much quoting directly, is if public officials at the state and local level would acquiesce in any torture, this satisfies the Convention Against Torture, even if the federal government would not similarly acquiesce. Every statement about acquiescence in the BIA's opinion. I don't understand your answer. The board says, moreover, the applicant has not demonstrated likely acquiescence by the Mexican authorities in the torture he fears. Now, that's not limited to national authorities. It's quite broad. Well, he described actions that one of his relatives took to pay off police. He testified that his family paid off the police in Tijuana every month. He had direct factual statements that were accepted as credible by the Mexican authorities. And the BIA gives no reason whatsoever why it disagrees with his statement that local law enforcement was corrupted. Well, they say that the government, furthermore, the immigration judge noted the applicant's acknowledgement of enforcement efforts of the Mexican government against the drug cartel leaders. They don't have to be successful. The question is, is this acquiesced by the government? But that all refers to national government efforts to combat local government. There's nothing in the State Department report that disclaims the idea that local government is being corrupted. And the color of law standard under acquiescence is satisfied if local government officials are acting under color of state law, which is not the case. The immigration judge, in this case, cited not only his testimony, but the Congressional Research Service report and the State Department reports that talked about the corruption at the local level of Mexican officials. In rejecting that, the BIA talks only about the efforts of the central government in Mexico, which we acknowledge, to deal with drug trafficking. And that's simply not dispositive of the question of whether or not individuals acting under color of state law would acquiesce in the torture, in this case. Thank you, Your Honor, for your attention. Okay. Thank you. We'll hear from the government. Okay. Please, the Court. Once again, Brooke Maurer for the Attorney General Respondent. As noted, this is a two-part inquiry, is whether Estrada met his burden of showing it was more likely than not that he would return and torture New Mexico, and whether that he would suffer torture by or with the acquiescence of the government. In responding to the Board's initial inquiry, as noted before in the previous case, it's like the Board, and as we argued in our brief, the Board did not, they looked at the factual findings of the IJ for clear, and clearly did not find it or reverse or anything for clear. We argued that. I think there's a problem there, then. What is it in JFF that justifies the Board ignoring the regulation that says they review IJ findings of fact for clear error? Well, they, I mean, there's nothing that's actually making them ignore it, as the government argues. Let me start with another step, then. Is it true that the regulations say that the BIA's review of a finding of fact by an IJ is based on a clearly erroneous standard? Yes. That standard doesn't apply to the Attorney General? No. JFS is the decision of the Attorney General, and I don't see anything there that discusses the BIA's authority to review a factual finding based on any standard other than clear error. Correct. So how is it you tell us that they're not required to review findings of fact for clear error? Well, we are saying that they did review for clear error, and they found no clear error in the findings that the IJ made. Well, let's start. They found no clear error. And what I'm saying is, is that they found no error in what the IJ held as far as, like, what the facts were. However, they were able to, once they made that determination, apply JFF to the case, which would construct a de novo review of how the IJ applied it to the case, is what we are arguing. And we are arguing that the clear error, like, that they erred in, or that they actually applied clear error improperly, they're stating is that then they can review whether or not those facts did support. Well, if the factual findings included a determination that more likely than not he will be tortured upon return to Mexico with acquiescence of government officials, how is it not a review of a factual finding that should be applying the clear error standard? Well, no, they did. I mean, I don't see that they did. And you just told me that they didn't. You told me they didn't find anything clearly erroneous about the findings. Well, if they didn't, how did they say the ultimate finding is clearly erroneous? Well, the board noted and the IJ even noted that its ultimate finding was even, they even mentioned that, you know, although speculative and, you know, reaching out those magical words, there was no clear finding in half of the things. It was based on the testimony. Well, let's pick it apart then. To begin with, Judge Rakoff raised this question with the opposing counsel. You may have heard it. It looks like there's at least one specific factual misstatement in the board's order, specifically identifying the statement on page 2 that criticizes Petitioner for not having shown, quote, among other things, the basis of his family member's alleged assumption that he took over the drug cartel after his cousin's death, citing to the IJ decision. Now, he didn't allege that, and the IJ didn't find that, did he? There's no real doubt the family member would know whether or not he took over the family member's cartel. That's an allegation that pertains to whether the rival gang knew he took or thought he took over his family's cartel. So isn't that a factual misstatement in the BIA's decision? I mean, I know, I mean, I know that the IJ does mention the fact that, yes, I mean, like that the, that his family members had been killed and that the cartel Now, let me be very specific. I understand the allegation to be that the rival gang, I mean, the BIA, the Petitioner is complaining about threats from two different sources. His own family's gang, because they thought he might be an informer, and the rival gang, who might have thought that he had taken over his family's gang. The IJ statement is very clearly pertaining to the perception of the rival gang that he may have taken over his family's gang. But the BIA talks about something different, about whether his family thought that he took over his own family's gang, which is sort of nonsensical on its face, but not what either the Petitioner has alleged or the IJ found. So it seems to me we have at least one clear error in the BIA's order. Isn't there also a second clear error, the one that your adversary referred to, when they say that he did not provide the names of any DEA agents, but he did provide the name of Agent Montez, yes? The ICE agent? It says here in the findings by the, or the discussion in this very paragraph we've been spending so much time on, that he, meaning the IJ, meaning the Petitioner, did not provide the names of any DEA agents, but in fact he provided the name of at least one, Montez, yes? Montez, I do believe, was an ICE representative, if I'm not mistaken. Not a DEA agent? No. So what does that, assuming you're right on that, what does that matter? The point is, he was identifying people that he had cooperated with. Well, that's who he'd be, like, speaking to if he was speaking to anyone, like, with, since he was incarcerated, there's an ICE agent that is technically in charge of his case. And I do not believe, I also believe that there's nothing in the record that shows, that also completes his assertion that they were interested in continuing anything further with him. And I'd have to, I'd have to give you the cite on that, because. Well, how is that relevant? His concern is that his family thinks he's cooperated with the government. I don't think it matters to anybody who's concerned about informing whether it's ICE or DEA, and it really doesn't matter whether the agents think there's anything more to be tamed from him. His risk is that the family thinks he's cooperating. No, we're talking about the Nolan family, not his own family at this point. Either way, I think the risk of informant has more to do with his own family. The risk from the rival gang is that he's now taking over his family. My additional point on this is this chain of suppositions really isn't a chain. I mean, the BIA faults him for not, let's read it. Or for anyone's belief, he turned over information to the Drug Enforcement Administration. But he's already testified, credibly, about the threats, about the kidnapping. Somebody's out to get him. Why is it part of a supposition that he has to prove how it is they found out? Well, I think the board looked at everything in its totality, and they looked at how the IJN that they found out. Well, let me, let me, how is it a part of the chain of suppositions that he has to prove how somebody found out if he's already testified, credibly, about the threats he's receiving and being kidnapped? Somebody's out to get him. Why is it part of a chain of suppositions that he has to prove how they found out? Well, I don't think it was like, I don't think it was like how they found out. Well, that's exactly what it says. No, no, let's read it again. Well, no, I'm not, I know it says that, Your Honor, and I agree, but there's also additional, there's additional factors at the board. You've told me they didn't find anything clearly erroneous, they didn't find erroneous that he's received threats, that he's been kidnapped and so forth. Didn't find erroneous his testimony as to why he thinks or how they think they found out. And yet the BIA is saying, well, he didn't prove how somebody found out. And I don't see how that makes any difference at all. Well, I think, as the government argued in their brief, they basically held that the evidence, just his testimony alone, there was no direct evidence in the record that would support the IJ's findings. That's what they were resorting to. Findings about what? Findings have to be supported that you don't think has been supported. Well, as the agency found, as they were looking at, there was no torture in the past. The petitioner had been back. Wait a minute. Wait, wait, wait. Here's somebody who's received threats and been kidnapped. I don't see anything in the BIA decision that says we don't think he suffered torture or is at risk of torture in the future. That's not what they're criticizing in the IJ's conclusion. Well, the board did note that he did not claim to have been tortured in the past and that they also acknowledged that the kidnapping he in fact did not happen in the past and in the future. And the fact that it is noteworthy that petitioner's family, I mean, yes, they are, he alleged that they were involved in the cartels, which were both prevalent in both San Diego and Tijuana. Petitioner has been, you know, as noted throughout the record, has been in the jail, has been returned, and there had been no other issues that had happened to him there as well, which the board, you know, had the opportunity to look at, obviously, you know, as the record as a whole. And the board found that it still was not sufficient, what the board had found, or what the IJ had found, to support a grant of deferral of removal. If I may also respond to the petitioner's, like, assertion that the government would acquiesce and or participate in, like, the torture that he fears. Contrary to the assertions, the country reports do indicate that the government has started taking monster measures in far as, like, going to Mexico. Is there no corruption among local police authorities in Mexico? Yes, there is. So the fact that the national government may be trained to combat it doesn't eliminate the possibility that a local police chief is on the take, does it? No, but there are also notes in the country reports that they have been putting, like, Federal people into local areas where they know that corruption is, in order to help thwart and stop the additional corruption. The corruption is primarily because of drug trafficking and corruption of police for that purpose, yes? Correct. So doesn't it fit exactly his situation? Yes and no, because in the additional reports that were submitted, the 2000, the reports that were in the first remand to the IJ, in addition to the articles that were submitted, the very people that Petitioner testified to saying that were harming him had been arrested back in 2001, and the government had, you know, from a local agency picked him up and they took him over to Federal custody and they had been staying in Mexico where he was finally sentenced in 2010. So they're making an active, you know, an active presence known and they're actually, like, increasing how they're taking care of things, especially people that are directly related to the Petitioner's, you know, plight. And I believe that's what the board noted. But maybe I'm missing the point. The IJ found and drew the reasonable inference, and clear error applies not only to findings of fact, but reasonable inferences drawn therefrom, that he would likely be subjected to torture, murder, or whatever, that the plaintiffs would likely be subject to torture, murder, or whatever, that the police would acquiesce in. You're saying that you're not denying that the police are corrupt. You're saying that the government's doing its best, more than they used to do, to try to deal with that. Why does that in any way say that the finding that he would still be subject to this is clear error? It's just all you're saying is it may not be quite as probable as it once was, although one reading the newspaper would have doubts about that. Well, I mean, like I said, I believe that relying solely on the country reports, you know, like the Petitioner, there was additional direct evidence. I think that's what I was saying, is that there was additional evidence, in addition to the country reports alone, that showed that once that person was arrested locally and taken in, that there was, it was not just full-blown corruption in the local police departments. The government is taking care of that. So I think that that was supporting of its own, in addition to the country reports. Well, let me ask, Mexico is not a quiet, peaceful, harmonious place, particularly on the border. Any given week, you're going to read, in this part of the country, you're going to read stories about difficulties. And I'm not saying the Mexican government isn't trying to do something about it. Their efforts should be commended. But it's hard for me to reach the conclusion, the fact the national government is doing something about it. There's no reason to be concerned if there's not a dispute that this person is related and has himself previously been part of the drug cartel that is powerful in Tijuana, or that he has concerns about rival gangs which remain powerful. I mean, can we really, is it really the government's position that the problems with the drug cartels in the area of Tijuana have now been abated, so that there's no reason for concern? No, and I think what the board basically held is like it wasn't enough to show that it's more likely than not that he will be tortured. Well, but what piece is missing? If you're not saying the drug cartels have been beaten, so there's not reason for concern. And there's nothing that said that his family might not be out to get him because they're concerned he's been an informant. And there's nothing that says that the rival gang might not have figured out or thought that he's now the leader of his family's gang. Putting those pieces together, I'm trying to figure out what's missing from the conclusion of the IJ that more likely than not he faces the prospect of torture upon removal to Mexico. What piece is missing? Well, that's something I can't speculate on. I don't know. I can't. But the BIA did. And the BIA said there's a chain of suppositions and something's missing. And so my question to you is, what's missing? And if the answer is you can't tell me, then it suggests to me the BIA's conclusion isn't based on anything. Well, no, I mean, just based on the facts that they reiterated, like, pursuant to JFF. I mean, as far as, like, you know. No, no. JFF says if there's a chain of suppositions, you've got to prove more likely than not at each one. I think I just gave you the chain of suppositions. And I'm asking you, which one has not been established as more likely than not true? Which one? And if the answer is all of them have been established as more likely than not true, then what's the basis for the BIA's decision? Well, I mean, if the court finds that it's not supported by substantial evidence. No, no, I'm asking you, you tell me what's the government's position, where's the weak link? The whole point of this is at the chain. Okay. Which link is the weak link? Because I haven't found it. Well, I mean, like I said, it's like the board relied upon the fact that, you know, there were specific evidence that was not in the record. It was just, it was basically speculation, everything that they had stated. He stated he had spoken to a DE agent, yet they couldn't provide any, you know, concrete proof as to whom he spoke to. He gave a name. Of an ICE agent. But what's the significance in terms of his family or a cartel being concerned he's an informer? Is it likely the cartel is going to dig out and say, well, if it's an ICE agent, we're not concerned? Well, no, I mean, he's going to be speaking with an ICE agent no matter what when he's in custody. I mean, there's going to be no chance of that. He knows who he was detained for. He had four pounds of marijuana on him. He was, I mean, there's no denying that, that he's in there, you know, for like a drug offense and the fact that he's there. But I mean, I don't think that that has the same type of connotation that it would have, you know, had he like identified a DE agent. I mean, like this is, I mean, people are going to be interested if you go to jail. I mean, somebody's going to talk to you. If you've got a high enough amount of drugs, they're going to try to like go and find the bigger fish. I mean, there's no additional information. And I believe that the board was clear when it said that in addition to having no torture in the past and like they noted that the kidnapping was ransom based, that they just basically noted that it was not enough for a grant of deferral removal. Thank you.
judges: Rakoff, Kozinski, Clifton